33079.   TYSON *v.* SHOEMAKER.

Decided June 15, 1951.

*Bell & Baker, Neely, Marshall & Greene,* for plaintiff in error. *Cain & Smith,* contra.

MacIntyre, P. J.  In *Tyson* v. *Shoemaker*, 83 *Ga. App.* 33, this court ruled, among other things, that the trial court did not err in rejecting two amendments referred to in division 3 of the opinion and in disallowing certain testimony re-

ferred to in division 2 of the opinion, special grounds 1, 2 and 3 of the motion for new trial. After the grant of a writ of certiorari the Supreme Court in *Tyson* v. *Shoemaker,* No. 17403, decided May 15, 1951, reversed the judgment of this court, which had affirmed the judgment of the trial court, the Supreme Court holding that this court erred in its ruling in division 3 of the opinion in respect to the two amendments and its ruling in division 2 of the opinion in respect to certain testimony offered in support of the two amendments, as stated by that court. While the Supreme Court specifically mentioned only special grounds 1 and 2 in referring to such testimony, we take it that the ruling also relates to the testimony referred to in special grounds 3 and 5 dealt with in division 2 of the opinion of this court, since it was obviously the intention of the Supreme Court to hold that all of such testimony was admissible in support of the two amendments. In any event we hold that under the ruling of the Supreme Court, such testimony was admissible. The ruling of the Supreme Court also nullifies, of course, our ruling in division 1 on the general grounds of the motion for new trial, but leaves unaffected our ruling that the fourth special ground was without merit, in that it was incomplete for reasons stated, and our rulings as to special grounds 6 and 8 (ground 7 having been abandoned) complaining of excerpts of the charge of the trial court, all of which we here reaffirm. Because of the ruling of the Supreme Court our former judgment of affirmance has been vacated, and the judgment of the trial court is now reversed because of the errors in rejecting the two amendments and in overruling the defendant's motion for new trial.

*Judgment reversed. Gardner and Townsend, JJ., concur.*

MacIntyre, P. J. In our decision in *Tyson* v. *Shoemaker,* 83 *Ga. App.* 33, the writer did not intend to indicate that "negligence per se has a superior legal weight to negligence as determined by a jury." However, the Supreme Court's interpretation of our decision takes precedence over our own interpretation of it, and now as always the writer yields to and follows the decision of the Supreme Court.

Speaking for himself alone the writer desires to make the following observations: It was not considered, for reasons presently to be advanced, that the plaintiff in error presented to the

Court of Appeals any contention that an unofficial stop sign would raise a jury question as to whether or not a motorist having the right of way at an intersection would be negligent in failing to heed such sign and stop. The issue presented by the plaintiff in error, it seemed to the writer, was whether or not the stop sign *required* the motorist to stop as a matter of law, and he intended to hold that the plaintiff in error had not presented a jury question to the court in that respect. It should be borne in mind that in his original answer the defendant asserted that the stop sign had been erected by the State Highway Department, thus apparently seeking to give it official sanction so as to require the plaintiff to come to a complete stop. This allegation would have served the defendant in good stead in establishing the stop sign as an official one except for the fact that the act of 1939 (Ga. L. 1939, pp. 295, 298; Code, Ann. Supp. § 68-315 (a)), which authorizes the State Highway Department to erect stop signs in certain instances limits its authority to acts without municipalities. This position was not adhered to, but upon the trial the defendant offered two amendments which were subsequently rejected by the trial court on motion of the plaintiff which, it is stated in the brief of counsel for the plaintiff in error, the defendant in the trial court, filed in this court on May 15, 1950, was on the ground, as quoted from counsel for the plaintiff in objecting to the amendments that "a stop sign could not be legally placed out there except by the duly authorized regulation [or] ordinance of the city." It seemed to the writer from such concession by counsel, as to the ground of objection, that the trial court properly rejected the amendments as seeking, not to raise a jury question, but to require absolutely that the plaintiff stop. Let these amendments now be fully examined. The first reads: "That on said date of February 3, 1947, and for a number of years prior thereto a sign was and had been maintained on the east side of North Broad Street and just south of the right-of-way of State Road No. 38, in Cairo, Georgia, showing that said highway was a *through highway* and having the word 'stop' thereon; that while said sign was thus maintained and on said date it was the *practice and custom of operators of motor vehicles including the plaintiff, when traveling northward on North Broad Street to*

*recognize said 'stop' sign and to give preference to the vehicular traffic of said highway by coming to a stop before entering or crossing said highway;* that the plaintiff well knew that said 'stop' sign was and had been thus maintained at the aforesaid location and also well knew that its purpose was to give priority to vehicular traffic on said State highway over vehicular traffic on said Broad Street, and that in compliance with the practice and custom thus observed at said intersection it could and would be reasonbly expected by the operator of defendant's log truck and by any other person operating a motor vehicle on and along said highway that he, the plaintiff, would give priority to all such highway traffic and *bring his automobile to a stop before entering or crossing said highway;* that the plaintiff . . *usually observed and complied with said practice and custom, but that on the particular occasion described in the plaintiff's petition he altogether disregarded said 'stop' sign and said practice and custom,* and approached to and entered said highway at an unabated speed and crossed to the line of travel of the defendant's truck and blocked its path in the manner aforesaid without any notice or warning." The second amendment alleged that the sign was "a metal sign affixed to a post, said metal sign being *approximately two feet square, and having thereon in large letters the words 'Through Street Stop;'* that this sign had been erected at said position in the year 1934 *by the Street Superintendent of the City of Cairo on orders from the Chairman of the Street Committee of the Mayor and Council of the City of Cairo* and had continuously remained in said position up to and including the day of the accident; that the Pelham highway (State Road No. 93) immediately north of State Road No. 38 is a continuation of North Broad Street and a *like metal sign of same size and having same words and letters thereon was in the year 1934* under exactly the same conditions and circumstances erected and placed on the west side of said Pelham highway or continuation of North Broad Street and near its intersection with said State highway or Road No. 38 and had also been continuously maintained in said position up to and including the day of the accident; that the said J. S. Shoemaker had actual knowledge that these signs were so maintained and that by reason of the aforesaid location and language of said

signs that the public generally, including the defendant's truck driver, would rely on him, the *plaintiff, to give observance and due regard to said signs and stop before entering said intersection;* . . and that the act of the defendant [plaintiff?] *in failing to stop* before entering said intersection, in accordance with the known and understood meaning of said sign, which he well understood *to require him by its language to stop* before entering said intersection was the proximate cause of the plaintiff's damages and injuries as sued for, and therefore he is not entitled to recover in this action." It will be noted that there is not the slightest intimation in either of the amendments that the purpose was to raise a jury issue. It seemed to the writer that in the first amendment the pleader was seeking to have the court to hold that the plaintiff was *required to stop as a matter of law* because of an alleged custom to observe a stop sign which was not shown to be official. It seemed to the writer that in the second amendment the pleader was plainly seeking to have the court hold that the plaintiff *was required to stop as a matter* of *law* because the alleged stop sign had been erected at the direction of the Chairman of the Street Committee of the Mayor and Council of the City of Cairo, thus endeavoring to give official sanction to the sign in question. Witness the italicized words in the quoted amendments.

But if any doubt should arise in this respect, it would seem that the doubt is immediately dispelled by a reading of the following quotations from the briefs of counsel for the plaintiff in error, unmistakably showing that the issue they wanted decided was that the plaintiff was *required to stop* and not that the alleged stop sign presented a jury question in that respect.

From the brief of counsel for the plaintiff in error filed in this court on April 21, 1950: "It is our contention that the existence of that warning sign imposed on the plaintiff below a duty to stop his car before proceeding into State Road No. 38, and gave the defendant below a correlative right to have him stop."

From the same brief: "The aforementioned authorities indicate that in the case at bar the defendant in error had a positive duty to stop before entering State Road No. 38."

From brief of the plaintiff in error filed May 3, 1950: "In order to clarify our position for the courts and for opposing coun-

sel, we would like to restate our position here and now. We contend that the stop sign in question, *no matter who erected it, or by what authority they did so,* obligated any motorist approaching State Road No. 38 on Broad Street to *bring his vehicle to a complete stop* before crossing or entering into State Road No. 38." (Italics ours.)

From the same brief: "Why is it any more of an infringement on the legislative province to recognize a de facto stop sign than it is to recognize a de facto corporation?"

From the brief of May 20, 1950: "Under this view, it may be said that the stop sign located on Pelham Road and Broad Street at the place of their intersection with State Road No. 38 were *validly erected stop signs and, therefore, the plaintiff was bound to bring his automobile to a full and complete stop* before driving it into State Road No. 38." (Italics ours.)

In view of the above we were of the opinion that no issue was presented by the defendant that the stop sign, though unofficial, apparently conceded by both sides to have been at the intersection, raised a jury question as to whether or not the plaintiff was negligent in not heeding it and stopping before exercising his right of way in entering and proceeding through the intersection, and, accordingly, we decided the question raised by the defendant as one of law. If only a jury question was sought to be raised, it would have been entirely unnecessary to resort to such voluminous amendments as to the custom of others in heeding the sign and as to its having been erected under the direction of the Chairman of the Street Committee of the Mayor and Council of the City of Cairo. It is quite significant, too, that the defendant made no complaint in his motion for new trial that the trial judge did not charge the jury that if they believed that the plaintiff did not heed the stop sign it would be for them to say whether or not such omission was negligence.

The first excerpt quoted by the Supreme Court from the opinion of this court was as follows: Counsel also contended that the stop sign, even if unofficial, was sufficient to bring into operation the rules of the common law and *require* that the plaintiff, in the exercise of ordinary care, should heed the sign and come to a *complete* stop. We can not subscribe to this view." (Italics ours.) This statement was intended to show

that the Court of Appeals did not subscribe to the view several times stated in the briefs of counsel for the defendant hereinbefore quoted to the effect that the stop sign, though unofficial, would under the rules of the common law *require* a motorist at all times and under all circumstances to heed it and completely stop under the penalty of being adjudged negligent. It seemed to the writer that when a motorist is *required* by a sign to stop at all times and under all circumstances, as a matter of law, it is because the stop sign has been erected by lawful authority, and that the failure to obey such sign and stop is negligence per se. Consequently, after holding that the jury was authorized to find that the proximate cause of the plaintiff's injury was the failure of the defendant to yield to the plaintiff's right of way, which was negligence per se, the Court of Appeals then, reverting to the statement hereinbefore quoted as to the contention of counsel for the defendant as to the alleged fiat of an unofficial stop sign, stated, without ruling on whether an unofficial stop sign would or would not *raise a jury question* as to whether or not a motorist should heed it, stated that no such question had been presented to the court. The issue presented to the Court of Appeals, it seemed to the writer, was that the unofficial stop sign demanded as a matter of law that the plaintiff absolutely stop, leaving nothing for the determination of a jury as to whether or not he was negligent in not doing so, instead of merely slowing down to 3 to 5 miles an hour. This statement is made to show that the writer had no intention to indicate in the previous opinion that the court was under the impression that there is any difference between the weight of negligence as fixed by law and that found by a jury, and that what this court ruled on was whether or not, as a matter of law, an unofficial stop sign required the plaintiff, under the facts of the present case, to come to a complete stop before proceeding into the intersection.

The writer is frank to say, however, that had he been called upon to express an opinion before the decision of the Supreme Court, whose rulings, of course, we always follow and by which we are bound, it would have been his firm view that an unofficial stop sign would present no jury question as to whether or not a motorist should heed it when having the right of way at an intersection. While the question does not seem to have been

precisely before the appellate courts of this State heretofore, it has been held in a number of cases in other jurisdictions that unless authorized by lawful authority a stop sign at an intersection does not require a motorist to recognize an unofficial sign, it having no legal efficiency whatsoever. 2 Blashfield Cyclopedia of Automobile Law, § 1032; Fred W. Albright Grocery Co. v. Overfield, 32 Ohio App. 512 (168 N. E. 326 (1); Popp v. Berger, 264 Ill. App. 484. See also Bach v. Diekroeger, (167 S. W. 2d, 934); Hill v. Johnson, 139 Me. 144 (31 Atl. 2d, 326). Aside from any rulings on the subject, it would not have seemed to the writer that any such doctrine should be introduced into our jurisprudence. Of course, a motorist should heed a sign which is erected by lawful authority. His obligation is not debatable even by a jury. On the contrary, an unofficial sign knows nothing, sees nothing. It is quite unlike the notice which is given to a motorist about to enter upon a railway track by a person who at that moment sees a train approaching and communicates the fact of danger by waving his hand ominously to the motorist.

Let it be understood that the writer is not contending that, if a stop sign has the characteristics of an official sign, or if a sign has been placed where official direction has ordered that it be placed, and that a motorist should stop when encountering a "sign" at such location, he would not be burdened with a presumption that such sign is official, though such presumption be rebuttable. In the present case, however, it was not contended before this court that the sign here involved had the characteristics of an official sign, although in the application to the Supreme Court for certiorari it was stated that the sign had "all of the indicia of being official." All that the record before this court disclosed was that the defendant, in his original answer, referred to it as a "sign" having thereon the word "stop," and according to rejected testimony it was "a metal sign, approximately two feet square, having thereon in bold letters the words 'Through Street—Stop'," and in special ground 4 of the motion for new trial, which this court did not consider because of its incompleteness, it was complained that the trial court erred in not admitting in evidence a metal sign which was "the exact sign or facsimile" of the sign alleged to have been

at the intersection. Nowhere, however, was it sought to show what was in fact the official stop sign employed in the City of Cairo, Georgia. But even if the defendant had sought to avail himself of any such presumption aforementioned, he would have been rendered impotent by his own pleadings. In his original answer he rebutted any such presumption by asserting that the sign had been erected by the State Highway Department, apparently seeking to thus invest it with official sanction. But the act of 1939 (Ga. L. 1939, pp. 295, 298; Code, Ann. Supp., § 68-315 (a)), while authorizing the State Highway Department to erect stop signs in certain instances, specifically limits its authority to points *outside* of municipalities, and this allegation negatives any official sanction of the sign. Evidently the defendant became aware that this assertion would avail him nothing, because on the trial of the case he sought to amend his answer, without striking the above mentioned assertion, by alleging that the sign had been erected at the direction of the Chairman of the Street Committee of the City of Cairo. However, this court, as did the Supreme Court on certiorari, held that such direction would not make the stop sign an official one, the authority to regulate traffic and erect stop signs within the municipality being by the act of 1906 (Ga. L. 1906, p. 575) vested in the Mayor and Council of the City of Cairo. Without intending to speak for the court as taking judicial cognizance of what is the usual "stop sign" employed, the writer, speaking for himself alone, and admittedly somewhat in the nature of obiter, ventures the opinion that it will be found that within all municipalities and on the highways generally in this country the usual "stop sign" is one which is of standard design, octagonal in shape, and not one which is a square, two feet by two feet, as was the sign here involved represented to be. If this be true, it would seem that there should be little confusion among motorists, but if there be nondescript unofficial stop signs of divers form and nature they should be promptly removed by the proper officials, since if a motorist undertook to obey them all he would be led into confusion worse confounded.

It seems to the writer that if the unofficial sign had not been placed at the intersection, the defendant's truck driver would

not have been misled by it, and would not have relied on it as he sought to testify, but would have yielded the right of way, as required by the Code, § 68-303 (g), to the vehicle of the plaintiff on his right, and that the collision would not have occurred.